328 So.2d 617

**John Alvin LEE, alias John Ray Lee, alias John Lee**

**v.**

**STATE.**

**6 Div. 856.**

Court of Criminal Appeals of Alabama.

Jan. 20, 1976.

Rehearing Denied Feb. 17, 1976.

Robert R. Bryan, Birmingham, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and Quentin Q. Brown, Jr., Asst. Atty. Gen., Birmingham, for appellee.

LEIGH M. CLARK, Supernumerary Circuit Judge.

This appeal is from a judgment denying a petition for writ of error coram nobis. The case is a sequel to *Lee v. State,* 51 Ala.App. 332, 285 So.2d 495, cert. denied 291 Ala. 787, 285 So.2d 500, in which there was an affirmance of a conviction of murder in the second degree and a sentence of ten years imprisonment in the penitentiary in a case in which appellant was charged with murder in the first degree. A correct understanding of the summary of the evidence, the principles of law announced and the conclusions of the court is essential to a correct determination in this case, but so as not to unnecessarily lengthen this opinion, we adopt the opinion in the basic case by reference rather than by incorporation.

The coram nobis petition alleges that there was such a conflict between the interest of petitioner and the interest of another person who had been indicted for the same crime that petitioner's counsel, who also represented the other defendant, could not adequately represent petitioner on the trial for murder and that in such circumstance counsel's defense of defendant-petitioner on the trial deprived him of his right to counsel as guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States. The pioneer case relative to the conflict of interest portion of the right to counsel field of constitutional law is *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 2d 680 (1942), which we obligatorily and cheerfully follow.

In *Glasser,* Glasser had retained counsel prior to the commencement of the trial. A codefendant Kretske had retained another attorney, but the other attorney was not available at the commencement of the trial. The trial court appointed retained counsel for Glasser to represent the codefendant whose attorney was not available. Glasser made an objection, stating that he "would like to have my own lawyer representing me in court." The court then stated to the partner or associate of the retained counsel for Kretske that he would have to stay in the case until Kretske obtained a lawyer "if he isn't satisfied with you," and stated to Kretske that if he wasn't satisfied with the partner or associate of his retained counsel, "you will have to hire another lawyer. We will proceed with the selection of the jury now." Kretske and Glasser's lawyer then made it known to the court that Glasser's lawyer would represent Kretske also. During this time "Glasser remained silent," and Glasser's attorney represented him and Kretske throughout the trial. The Supreme Court concluded that the conduct of counsel retained by Glasser and imposed upon Kretske, in failing to undertake cross-examination of one of the witnesses for the prosecution and to object to certain testimony as being inadmissible was influenced by a desire to protect Kretske. The Court further held that "Clearly the statements were damaging." It was further stated:

"We hold that the court thereby denied Glasser his right to have the effective assistance of counsel, guaranteed by the Sixth Amendment. This error requires that the verdict be set aside and a new trial ordered as to Glasser."

Glasser himself was an experienced lawyer. Even so, it was held that he had not waived his Sixth Amendment right to counsel.

*Glasser v. United States* and its satellites are sufficiently related in principle to this case for us to give painstaking consideration to the position taken by petitioner-appellant.

On the coram nobis hearing, according to testimony of petitioner, petitioner's former wife (Alice Faye Lèe), who had also been indicted for the same murder, and their daughter, Katherine Marie (Kitty) Lee, they went to the decedent's apartment, seeking him by reason of his molestation of Kitty, then twelve years of age. Both Kitty and her mother testified that the man had run his hand up under the dress of the little girl and touched the private part of her body. This they reported to petitioner-appellant, the girl's father. Kitty, who testified on the basic case on the call of the State, had changed her testimony to some extent. She made it clear on the coram nobis hearing that she did not consider that she gave the jury the full truth, that she was deterred to some extent from doing so by reason of her fear of injuring her mother in her case, that, though she did not see the shooting, she was convinced that her father did not know that her mother had the pistol at the time she left the automobile and entered the apartment of the decedent. Mrs. Lee testified on the coram nobis hearing that she killed Mr. Walter, the alleged victim of the murder, that she shot him twice. She had given a detailed written statement to the law enforcement officers upon her arrest a few days after the homicide, in which she had to a great extent exonerated petitioner-appellant of complicity in the crime. Soon after the commission of the alleged offense, petitioner-appellant called Mr. Arthur Hanes, Sr., and employed him. He was also employed to represent Mrs. Lee. Mr. and Mrs. Lee testified in effect that both wished to take the stand and testify in Mr. Lee's behalf on the trial.

The two were separately indicted. After Mr. Lee's conviction and seemingly at about the time his conviction was finally affirmed, Mrs. Lee pleaded guilty to murder in the second degree and was sentenced to five years imprisonment in the penitentiary, and she was placed on probation.

From the time, or about the time, of the conviction of petitioner-appellant, Mr. Hanes' services as attorney for each of them were discontinued. Representing petitioner-appellant on his appeal in the basic case was another attorney. Representing Mrs. Lee on her arraignment, her plea of guilty and her application for probation was the same attorney, not Mr. Hanes.

Petitioner-appellant was convicted on September 25, 1972. The conviction was affirmed on appeal on August 14, 1973, rehearing was denied on September 25, 1973, and petition for certiorari was denied November 15, 1973. The petition for writ of error coram nobis was filed February 18, 1974. The petition was overruled on September 13, 1974.

There was no contention on the hearing that Mr. Hanes was not acting in good faith in representing both Mr. and Mrs. Lee. As stated by counsel for petitioner-appellant, in a question addressed to Mr. Hanes:

". . . I'm not contending you were not well prepared or you did not act in good faith."

No question is presented as to the outstanding ability and extraordinary experience of Mr. Hanes. The contention is solely a legal one, that is, that the representation of Mrs. Lee prevented Mr. Hanes from fully protecting the rights of Mr. Lee.

Both Mr. and Mrs. Lee indicated by their testimony that they had made it clear to Mr. Hanes that they both wanted to testify on the trial. They indicated that Mr. Hanes had indicated to them that such testimony would not be for the best interest of Mr. Lee and would be harmful to Mrs. Lee in her case. Though the contention of each is clear, the testimony of neither is definite enough to make it clear and convincing that any issue was ever made between either of them and Mr. Hanes, that either of them ever positively requested or demanded that he or she be allowed to testify.

Mr. Hanes testified in effect that his representation of Mrs. Lee never at any time caused him to do or say anything that he would not have done or said or caused him to omit to do or say anything that he would not have omitted if he had not been representing Mrs. Lee. He said that at times the question was asked by one or both of them as to whether he or she would testify, but it was never in the form of a request or a demand, but more as a matter of inquiry. With particular reference to whether they expressed a desire to testify, he said:

"No, sir. It was more of a question should I? Do you think I ought to do it? I said, John, let's wait. Let's go on —let's see what else they put on. There was no argument, no demanding, no me saying you've got to keep your mouth shut, you've got to acquiesce in it, you've got to consent to it. He left that to me, after all, people would be foolish to go hire a lawyer and not listen to them."

As stated above, Kitty Lee changed her testimony on the coram nobis proceeding from what it had been on the trial of the case and to some extent from a previous affidavit that she had made to law enforcement officers soon after the homicide, at which interview Mr. Hanes as counsel for Mr. and Mrs. Lee was present. It should be noted also that the testimony of Mrs. Lee on the hearing of the coram nobis petition is considerably different from the statement she made to the police officers after her arrest. In her statement to the police officers, she said that when they confronted Mr. Walter at his apartment:

". . . [H]e grabbed me. When he grabbed me, I got the gun out of my purse. Johnny hollered at the man and said take your hands off her. Johnny was trying to pull me back away from the man. I don't know if the man saw the gun, I doubt if Johnny even saw the gun or the man. The guy kept wrestling with me, I don't know if he saw the gun

and was trying to get it or was trying to pull me away from Johnny. *The gun went off* and I was trying to back away, the man still had my arm with his other hand, he clutched at his stomach. I didn't see any blood, *so I really didn't know if the shot had hit him or not.* The man made a new attempt to pull me back again at the same time Johnny was trying to pull me backwards. The gun went off again. As the man was pulling at me again, he said goddam you *and when the gun went off the second time, I know it hit the man then. . . ."*

(Emphasis supplied)

On the hearing of the Coram Nobis Petition, she testified:

"Johnny said let's go and get the police and the man said you son-of-a-bitches are not going anywhere. Then he grabbed for me and *I pulled the gun out and shot him once in the stomach.* He kept coming at me *and I shot him again in the temple."* (Emphasis supplied).

We believe that we are not overlooking any authoritative cases on the subject of whether the constitutional right to counsel is impaired by reason of an attorney representing more than one jointly or separately indicted alleged criminal. We have considered *Bell v. State of Alabama,* 367 F.2d 243, (5th Cir. 1966), cited by appellant, in support of the statement found in *Williams v. Beto,* 354 F.2d 698 (5th Cir. 1966) as follows:

"It is the general rule that relief from a final conviction on the ground of incompetent or ineffective counsel will be granted only when the trial was a farce, or a mockery of justice, or was shocking to the conscience of the reviewing court, or the purported representation was only perfunctory, in bad faith, a sham, a pretense, or without adequate opportunity for conference and preparation."

Counsel underscores in the preceding quotation "or the purported representation was

only perfunctory." We think the representation here was not perfunctory only.

In *United States v. Pinc*, 452 F.2d 507 (5th Cir. 1971), the court held that a defendant was denied his Sixth Amendment rights. Counsel for defendant had also been counsel for defendant's wife. The wife had been indicted jointly with defendant. Her case was severed before the trial of defendant. The question then arose whether defendant's wife should be called by defense counsel to testify for the defense. Counsel contended that, because of his previous representation of defendant's wife and his receipt of confidential disclosures from her during such period, he was ethically precluded from questioning her. He was not allowed to withdraw his representation of defendant. It was held that this constituted "a denial of effective counsel in violation of defendant's sixth amendment rights."

To some extent *Pinc* is like this case, but there are distinguishing differences. No contention is made in this case that Mr. Hanes was ethically precluded from calling Mrs. Lee as a witness. The contention is strongly to the contrary, that he should have called her. In *Pinc* it is stated, "We have no doubt that Mrs. Pinc's affirmance of her previous confession under oath at trial would have significantly added to Mr. Pinc's defense in this cause. Prejudice thus flowed from defense counsel's inability to elicit such an affirmance." No such statement can be made in this case. It was not merely doubtful that the testimony would help, but counsel had a strong conviction that Mrs. Lee's testimony would not hep Mr. Lee. One reason, made clear by counsel, was that he believed that testimony by Mrs. Lee or Mr. Lee would furnish a motive for the killing, that the testimony of the State had not provided any motive, that there was an excellent chance of defendant's acquittal when the State rested its case. It is clear that he did not see a good chance of an acquittal by placing Mrs. Lee or Mr. Lee on the stand as witnesses. There would have been much in their testimony to have evoked sympathy from the jury, and in fact admiration on the part of some jurors we must acknowledge, that they would go armed to the apartment of a man who had abused their daughter. On the other hand, counsel knew that such circumstance would not constitute a legal defense either to murder in the first degree or murder in the second degree, on the part of either the person who went armed to decedent's house to avenge the injury to their daughter, or the other parent who accompanied the one with a pistol. Furthermore, counsel knew (1) that the testimony of the mother tending to exonerate the father as to this particular matter would have been viewed with great suspicion, which would have most likely redounded to the injury of the defendant and (2) testimony of the defendant placing the blame on the mother of the child would, even if true, been looked upon, by some jurors at least, as reprehensible, which of itself would have hurt the defendant. In this connection, it is significant that in the statement Mrs. Lee made to the police officers she said the "gun went off," while in her testimony on the coram nobis hearing she said that she "pulled" the pistol and shot the decedent twice. Clearly she was not as exonerative of Mr. Lee in the statement she had given to the police officers, with which counsel was acquainted, as her evidence on the coram nobis hearing indicates, with which counsel was not acquainted.

As to the testimony of Mrs. Lee, of which petitioner says he was deprived by reason of a conflict of interest on the part of his counsel, we are asked to say in effect that her counsel retained jointly by her and Mr. Lee, refused to allow her to testify by reason of his loyalty to her, but that if she had had independent counsel with undivided loyalty to her, he would have allowed her to testify. We do not follow this line of thought. True it is that she could have testified, after being properly

advised by the court, even though her lawyer advised her to the contrary, but we cannot believe that under the circumstances of this case, if she had had separate counsel, she would have testified. It is clear to us that in the light of all the information her counsel had on the subject at that time it was not for the best interest of Mr. Lee for her to testify. In addition, as her counsel explained on the coram nobis hearing, protection of her did not actually enter into considerations by her counsel as to placing her on the witness stand. As he stated, the prosecution had the benefit of everything that he understood that she would say, this by her sworn statements as to what occurred.

As to the contention that counsel's joint representation prevented him from calling defendant as a witness, we note particularly what the trial court in the coram nobis case said:

"There was no serious contention that petitioner himself insisted on taking the witness stand and was overruled by his lawyer."

The trial judge patiently conducted the hearing. Notwithstanding the coloring of the testimony, chameleonlike in many respects, when compared with what had been said years before, the trial judge was in a much better position than we to get to the truth. He concluded:

"After hearing all of the evidence on the petition for error coram nobis and studying the transcript of the trial in chief, I am convinced that the claims of petitioner are without merit and that the petition should be denied."

We do not disagree.

Although the principle set forth in *Glasser, supra,* has not been limited to cases in which there were joint trials of two or more indigent defendants represented by appointed counsel, it is less difficult to find an infringement of one's Sixth Amendment right in such cases than in those where the parties, sui juris, have retained their own counsel and are not being jointly tried. As observed in *United States v. Bell,* 165 U.S.App.D.C. 146, 506 F.2d 207, 225 (1974):

" . . . Since Cardwell did not stand trial, the usual spectre of injury—from inconsistent intrial courses of action for multiple clients—could not possibly materialize. . . ."

In *United States v. McCord,* 166 U.S.App. D.C. 1, 509 F.2d 334, 351 (1974), cert. denied 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed. 2d 87, in which the Court examined and determined adversely to defendant his contention that he did not have effective assistance of counsel by reason of alleged greater loyalty to another than to defendant, it was stated:

" . . . This claim of ineffective assistance is generically different from the usual claim made in this Court which generally consists of an indigent defendant, court-appointed counsel and an allegation of incompetence. . . ."

We are also of the opinion that even though petitioner-appellant was not learned in the law, as was his counsel, and that he would not have been as aware in general of the complexities that might arise from representation by single counsel of two or more parties, he did from a practical standpoint understand them well enough for him to have taken positive action to have obtained that which he now says was his right. As to his consideration of Mrs. Lee's testifying, his testimony on the coram nobis hearing is partly as follows:

"Q. I will ask you whether or not either at the time of your trial or before then, there was any discussion in your presence by Mr. Hanes concerning whether or not Alice Lee should testify in your behalf at your trial?

"A. Yes. There was quite a bit of discussion about it.

"Q. All right. Was it before the trial, during the trial, or both?

"A. Both.

"Q. The conversations concerning this before the trial; where were they held?

"A. At various places, in the Courtroom, in his office, different places.

"Q. And what . . ."

Within less than a year, in at least two cases, the United States Court of Appeals, Fifth Circuit, has considered the question of waiver of the Sixth Amendment right as applied to counsel's representation of two or more clients with conflicting interests. In *Foxworth v. Wainwright*, 516 F. 2d 1072, n. 17 (5th Cir. 1975), the court, speaking through Judge Ainsworth, said:

"There is no indication of whether, at the time of his appointment, counsel made any objection to representing three of the defendants jointly. The record reveals no motion to withdraw at trial. In any event absence of an objection on the part of counsel would not necessarily show that no conflict of interest existed. For the same reasons, *and also because Foxworth was a minor at the time of trial, the absence of an objection or motion to withdraw did not constitute a waiver* of his right to effective assistance of counsel. . . ." (Emphasis supplied)

In *United States v. Garcia*, 517 F.2d 272, (5th Cir. 1975), the trial court had refused to allow multiple defendants to be represented by attorneys retained by them, by reason of their simultaneous representation of other unindicted persons, some of whom were potential witnesses against the defendants. For the court on appeal, Judge Gewin said:

" . . . We are fully conscious of the serious and delicate nature of the issue presented. A resolution of the problem requires a cautious and sensitive consideration and balancing of individual constitutional protections, public policy and public interest in the administration of justice, and basic concepts of fundamental fairness. While we remain wary of the hazards of potential conflicts of interest in this case, we conclude that even should such conflicts exist, the defendants enjoy the right to knowingly and intelligently waive any disqualification noted by the district court. Accordingly, we remand to that court for a determination as to whether the appellants in this case wish to make such waiver in accordance with the principles herein delineated."

It is understandable that no pre-trial inquiry was made in this case and that no conflict of interest problem was presented until there was final disposition of both murder cases. Whatever potential conflict of interest existed theretofore was outweighed by the natural joint interest the father and mother had in their abused daughter, which they had shown by their conduct at the time of the crime involved and which they can be expected to have, not only in the particular child but also in all their children, as long as they live. In that interest they were then, and likely will continue to be, united. The same children for whom the mother expressly and eloquently pleads, in some of her testimony on coram nobis in asking that their father be released from the penitentiary, needed a mother, as well as a father, at the time of the homicide trial of petitioner-appellant. As to that there was no conflict, and reluctant would anyone have been, particularly the father, to do anything to deprive them of her. Both of the accused knew, certainly appellant knew, that they did not have to employ the same attorney. It is obvious that both wanted Mr. Hanes to represent them. This was their right under the same guaranty of the Sixth Amendment as is the right appellant contends he was denied.

Varying circumstances and conditions of parties lead to different conclusions on the

question whether one has voluntarily, knowingly and intelligently taken a particular course of action. Worthy of major consideration are the relative reasonableness or unreasonableness of the course pursued, the age and condition and apparent intelligence of the parties involved, and the hazard or undesirability of pursuing a different course. All of these, we think, weigh heavily, if not conclusively, against appellant.

The record, particularly the testimony of Mrs. Lee, shows that appellant, nearly forty years of age at the time of trial, the father of several children by Mrs. Lee, was extraordinarily capable, to the point of sophistication and magnanimity. We are fully persuaded that he knew what was involved in the matter of representation by Mr. Hanes of both Mr. and Mrs. Lee. He voluntarily elected to do that which many other red-blooded men would have done under the same circumstances, point no finger at Mrs. Lee and decline to allow her to extricate him from a predicament as to which under all the evidence he to some extent was a responsible party. We admire him for it.

The judgment of the trial court should be affirmed.

The foregoing opinion was prepared by Supernumerary Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under Section 2 of Act No. 288 of July 7, 1945, as amended; his opinion is hereby adopted as that of the Court. The judgment below is hereby

Affirmed.

All the Judges concur.

CATES, P. J., concurred in result only.